## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Bernard TOKARZ, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | 1:25-cv-00566-VMC |
| | ) | |
| CITY OF ATLANTA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>

Defendant Shannon K. Manigault ("Ms. Manigault") hereby moves to dismiss Plaintiff's claims against her in their entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6).

### I.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *id.*, and courts should not

"accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550

U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"Because qualified immunity is a defense not only from liability, but also

from suit, it is important for a court to ascertain the validity of a qualified

immunity defense as early in the lawsuit as possible." *Paez v. Mulvey*, 915 F.3d

1276, 1284 (11th Cir. 2019) quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.

2002) (reversing district court's denial of a motion to dismiss on qualified

immunity grounds).

## II.   Facts

The relevant facts set forth in the Complaint, in addition to facts of which

this court may take judicial notice[1], are as follows:

Article 8 of the Charter of the City of Atlanta establishes the City's Office

of Inspector General ("OIG"). *See* Attachment 1 (full text of Article 8).[2] OIG is

---

[1] Plaintiff fails to include a number of documents he refers to, and partially
quotes from, in the Complaint. These documents include Article 8 of the City of
Atlanta's charter; OIG's August 14, 2024, investigative report regarding Mr.
Tokarz and others; and OIG's October 2, 2024, letter referring certain matters to
Georgia's Government Transparency & Campaign Finance Commission ("CFC"),
of which Plaintiff attaches only a heavily redacted copy. The complete
documents are critical to understand the full context of Plaintiff's claims, and Ms.
Manigault has attached them hereto. The Court may take judicial notice of these
documents because they are "(1) central to the plaintiff's claims; and (2)
undisputed, meaning that [their] authenticity is not challenged." *Johnson v. City of
Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).
[2] As discussed further *infra*, the City Council passed substantial amendments to
Article 8 on February 17, 2025, after the events giving rise to this case. The
amended version is included as Attachment 2.

"tasked with investigating 'allegations of fraud, waste, abuse, and corruption, of City of Atlanta employees, elected officials, commission and board members, vendors and subcontractors who do business with the City of Atlanta.'" Doc. 1 at ¶ 11 (quotation marks in original); *see also* Attachment 1 at § 8-101(b).

Article 8 gives OIG numerous powers and responsibilities. Section 8-106, which creates the "Compliance Division," states, in pertinent part:

> (a) *Jurisdiction.* The Inspector General, as the director of the Compliance Division, shall have the non-exclusive jurisdiction to investigate and take appropriate action regarding: [. . .]
>
> (4) Allegations of violations of Chapter 2, Article X; of Chapter 3; or Chapter 114 of the City Code of Ordinances [. . .]
>
> (b) *Duties and Responsibilities.* The duties of the Inspector General as the director of the Compliance Division shall include, but not be limited to, the following: [. . .]
>
> (8) Reporting, as appropriate, suspected criminal violations of a law, rule, regulation, or internal policy related to a matter under the Compliance Division to the local, state or federal law enforcement agency with proper jurisdiction; [. . .]

Attachment 1.

Chapter 2, Article X, of the City's Code, "Ethics in Public Contracting"[3], which is one of the specifically enumerated areas where OIG has jurisdiction, contains numerous criminal law penalties. To wit:

---

[3] "Ordinances that are central to a case are judicially noticeable." *Vazzo v. City of Tampa*, 2018 WL 4610998, at *2 (M.D. Fla. Mar. 15, 2018) (citing *Peterson v. City of Greenville*, 373 U.S. 244, 256–57 (1963)).

**Sec. 2-1488. - Penalties.**

(a) *Criminal penalties.* To the extent that violations of the ethical standards of conduct set forth in this division constitute violations of state law or violations of the city standards of conduct set forth in section 2-807 of this Code, they shall be punishable as provided therein. [. . .]

Attachment 3.

Furthermore, Chapter 3, "Transparency," over which OIG has specific jurisdiction, provides for criminal penalties:

**Sec. 3-2. - Compliance with chapter required.**

[. . .] if applicable, violations of the requirements of this chapter by employees, vendors, or contractors may be referred to the appropriate authorities for criminal prosecution or civil enforcement. [. . .]

Attachment 4.

The Charter specifically empowers OIG "in furtherance of an investigation" to "issue subpoenas to compel the production of documents and things" to "any person." § 8-101(e)(4).

On February 17, 2025, after the events giving rise to this case, the Atlanta City Council passed legislation overhauling the operation of OIG and substantially limiting its authority. *See* Attachment 2. Among other changes, OIG is *now* required to obtain judicial approval prior to issuing any subpoena to a third party; and OIG *now* must notify the persons whose records are sought of the subpoena "simultaneously with its issuance to give the person or entity

whose information is sought an opportunity to contest the validity of the subpoena pursuant to a motion to quash before the disclosure of the records." *Id.* at 5 (amended Section 8-101(e)(5)).

Another key change: the amendments add the language, "Investigations conducted by the Office of the Inspector General are administrative in nature." *Id.* at 3 (amended Section 8-101(b)).

Between May 26, 2022, and April 26, 2024 (that is, prior to the February 2025 amendments), OIG issued a number of subpoenas to financial institutions as part of its investigations. Doc. 1 at ¶¶ 21-113. The Complaint describes a total of twenty-four (24) subpoenas, only one (1) of which, to Southern First Bank, dated March 23, 2023, sought financial records concerning Plaintiff. *Id.* at ¶¶ 45, 46. The subpoena asked the bank "please" not to notify Plaintiff of the subpoena because doing so "could impede the investigation being conducted and thereby interfere with enforcement of the law." *Id.* at ¶ 48. Plaintiff does not allege that OIG took any actions to threaten or coerce the bank into producing any documents, nor even that the bank produced them.

On August 14, 2024, OIG "issued a report" regarding Mr. Tokarz and others. *Id.* at ¶ 121. While Plaintiff has not provided the report to the Court, Ms. Manigault has attached it hereto as Attachment 5. The report contains substantial, detailed evidence that Plaintiff and others engaged in corruption and financial misconduct. The report bases its conclusions on witness interviews

(including with Mr. Tokarz himself), publicly filed documents (such as forms submitted to the City along with bids for City work), email correspondence sent to and from City email addresses, and financial records. *See generally* Attachment 5. As detailed in the report, Mr. Tokarz is a businessman who receives significant revenues from the City of Atlanta for various contracted services—ranging from landscaping to private security. *Id.* at 4. He also serves as a registered lobbyist and a central figure to the political campaign of City Councilman Julian Bond. *Id.* at 4-5. The report lays out evidence that, *inter alia*, Tokarz failed to disclose personal and business relationships with City officials when seeking City business, creating the appearance of impropriety and potentially corrupting the City's competitive bidding process. *Id.* at 5-12.

On September 3, 2024, Plaintiff alleges he "publicly denounce[d] [Ms. Manigault's] investigative methods," as well as her "Integrity, Objectivity, Independence, and Professional Judgment." Doc. 1 at ¶ 122 (title case in original). A copy of this alleged "public[] denounce[ment]" is attached hereto as Attachment 6. It is a letter dated September 3, 2024, from Plaintiff's attorney.

On October 2, 2024, OIG sent a letter to the Georgia Government Transparency & Campaign Finance Commission ("the CFC"), referring a number of suspected violations of Georgia's campaign finance laws involving Plaintiff and others and including images of five checks bearing Plaintiff's signature. Doc. 1 at ¶¶ 120, 123. Included as Attachment 7 hereto is the complete referral letter.

Plaintiff characterizes this letter as a "frivolous ethics complaint." *Id.* at ¶¶ 123-25. On its face, the letter is simply a referral to CFC of matters outside of OIG's jurisdiction. It refers the matter to CFC "for whatever action it deems appropriate," and concludes, "OIG has determined that this matter would be more appropriately addressed by your office." Attachment 7 at 1, 6.

In substance, the referral letter notes that the campaign committee for Councilman Bond had disclosed numerous expenditures with Plaintiff and a business he owned, yet upon review of financial information of one of those businesses, OIG located four (4) additional payments that were not disclosed. *Id.* at 2-4. The letter further notes five (5) expenditures that appear to have been made by Plaintiff's business entity toward consulting work for Mr. Bond's campaign which also were not disclosed on any campaign disclosure forms. *Id.* The letter notes Georgia Rules and Regulation Rule 189.3-04(2)(a), which requires a campaign to disclose such payments.

Plaintiff alleges, "The State Ethics Commission summarily dismissed Defendant Manigault's frivolous complaint." Doc. 1 at ¶ 124. He does not attach any sort of notice of dismissal, nor does he state the date or content of the alleged "dismissal."[4]

_____

[4] Ms. Manigault never received any notice from CFC related to this referral during her tenure at OIG. The undersigned has inquired to counsel for Defendant, who states that Defendant never received any written notice of dismissal and would not provide any further information on this point.

Plaintiff describes the referral to CFC as "clearly retaliatory" "complaint to the State Ethics Commission." *Id.* at ¶ 125. Plaintiff alleges Ms. Manigault would not have referred the matter to the Commission for further investigation "absent Plaintiff's protected speech." *Id.* at ¶ 152.

On February 3, 2025—that is, three (3) days before Plaintiff filed his Complaint—the City of Atlanta's City Attorney sent OIG a letter demanding that OIG "cease the practice of adding disclosure notices on [its] subpoenas," based on the City Attorney's opinion that subpoenas from OIG are "in the nature of those issued pursuant to O.C.G.A. Section 7-1-360(2)," instead of section "7-1-360(3)." *Id.* at ¶ 118. The City Attorney's "cease and desist" characterized OIG's subpoena practice as an "intentional violation" of the banking statute.[5] *Id.*

On February 17, 2025, Ms. Manigault resigned from OIG. *See* Doc. 6 at 2 n.1.

_____

[5] On the same day that the "cease and desist" was issued, the Mayor's Office issued a press release aggressively criticizing OIG and promoting legislation to amend the charter provisions governing OIG. *See* Attachment 8. Conflict between OIG and City leadership had been brewing for some time prior to the emergence of the "banking subpoenas" issue. For example, in a May 21, 2024, interview with Atlanta Civic Circle, Ms. Manigault described "an emergency," stating, "Hurdles have been erected to delay, impede, and disclose our confidential investigations," after OIG had investigated corruption by high-level officials. *See* "Atlanta's inspector general alleges 'widespread' efforts to impede investigations within City Hall." Atlanta Civic Circle. Published May 21, 2024. Available at https://atlantaciviccircle.org/2024/05/21/atlanta-inspector-general-alleges-widespread-impediments-to-investigations/.

### III.    Argument and Citation to Authority

#### A. Ms. Manigault no longer has an "official capacity" with the City, and she cannot provide the prospective relief Plaintiff seeks.

"[W]hen an officer is sued under [42 U.S.C. § 1983] in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent. Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Ms. Manigault has no "official capacity as Inspector General for City of Atlanta," because she has resigned from OIG. *See* Doc. 6 at 2 n.1. Therefore, the "official capacity" claims against her must be dismissed. *See, e.g.*, *Moore v. City of Roswell, Georgia*, 682 F. Supp. 3d 1287, 1303 (N.D. Ga. 2023) (dismissing official-capacity claims against retired city official because he "is no longer in a position to effectuate any relief that could be ordered by this Court"); Fed. R. Civ. P. 25(d) ("[W]hen a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending[,] [t]he officer's successor is automatically substituted as a party.").

Further, to the extent Plaintiff asserts Count I, which seeks injunctive relief, against Ms. Manigault in her individual capacity, it must be dismissed, as she is no longer a City official and has no authority either to infringe Plaintiff's rights nor enact injunctive relief.

**B. Qualified immunity bars Plaintiff's federal claims for damages against Ms. Manigault in her individual capacity.**

1. <u>Qualified immunity standard</u>

As the Eleventh Circuit Court of Appeals has repeatedly reaffirmed, the doctrine of qualified immunity:

> protects public officers from undue interference with their duties and from potentially disabling threats of liability. It allows government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation. Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible.

*Paez*, 915 F.3d at 1284.

"In order to establish qualified immunity, a defendant first must show that she was acting within the scope of her discretionary authority at the time of the alleged misconduct." *Id.* (citations omitted). Here, Plaintiff alleges Ms. Manigault violated his federal rights in two ways—by (1) issuing a subpoena to a bank seeking its records concerning him; and (2) referring certain matters involving him to Georgia's Government Transparency & Campaign Finance Commission ("the CFC").

As in *Paez*, there is no dispute that both these acts were within the scope of Ms. Manigault's discretionary authority when she was Inspector General. The City's Charter empowers OIG to "issue subpoenas to compel the production of documents and things" to "any person," Charter § 8-101(e)(4), and obligates OIG

to "report[] as appropriate, suspected criminal violations of a law, rule, regulation, or internal policy . . . to the local, state, or federal law enforcement agency with proper jurisdiction." *Id.* at § 8-106(b)(8). Plaintiff specifically alleges, "At all times relevant to this action Defendant Manigault . . . acted . . . in the scope of [her] duties with OIG." Doc. 1 at ¶ 134.

Accordingly, Plaintiff must show that Ms. Manigault is not immune to his claims. *See, e.g., Paez*, 915 F.3d at 1284 ("Once a defendant has established that she was acting within her discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.") Specifically, Plaintiff must show two things to negate qualified immunity, which may be analyzed in any order: (1) that she violated his rights <u>and</u> (2) that the unlawfulness of her conduct was clearly established at the time. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Manners v. Cannella*, 891 F.3d 959, 968 (11th Cir. 2018)).

Plaintiff may attempt to show a "clearly established" violation in three ways:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.

*Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

Under the first method, "plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the relevant State Supreme Court." *Id.*

"Cases do not often arise under the second and third methods." *Id.* at 1209 "They exist where the words of the federal statute or constitutional provision at issue are 'so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful,' or where the case law that does exist is so clear and broad (and 'not tied to particularized facts') that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1350–51 (11th Cir. 2002)).

   2.   Fourth Amendment claim

Count II of the Complaint asserts that, "Defendants violated Plaintiff's right to be free of unreasonable searches and seizures." Doc. 1 at ¶ 142. However, Plaintiff has no protected Fourth Amendment interest in the banking records.

The Supreme Court has long held that an individual does not have a Fourth Amendment right to the privacy of financial records in the possession of a bank. "Banks are . . . not conscripted neutrals in transactions involving negotiable instruments, but parties to the instruments with a substantial stake in their continued availability and acceptance." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 48–49 (1974). "The records of [Plaintiff's] accounts [. . .] pertain to

transactions to which the bank was itself a party.'" *United States v. Miller*, 425 U.S. 435, 440–41 (1976) (quoting *Schultz*, 416 U.S. 21 at 52). As in *Miller*, "[o]n their face, the documents subpoenaed here [were] not [Plaintiff's] 'private papers' . . . . Instead, these [were] the business records of the bank[]." *Id.* at 440. Supreme Court precedent on this subject could not be clearer:

> Even if we direct our attention to the original checks and deposit slips, rather than to the microfilm copies actually viewed and obtained by means of the subpoena, we perceive no legitimate "expectation of privacy" in their contents. The checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. The lack of any legitimate expectation of privacy concerning the information kept in bank records was assumed by Congress in enacting the Bank Secrecy Act, the expressed purpose of which is to require records to be maintained because they have a high degree of usefulness in criminal tax, and regulatory investigations and proceedings.
>
> The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*Id.* at 442–43 (emphasis added). *See also, e.g.*, *Shultz*, 416 U.S. at 53 (1974) ("We decided long ago that an Internal Revenue summons directed to a third-party bank was not a violation of the Fourth Amendment rights of either the bank or the person under investigation by the taxing authorities." (citations omitted));

*Hickey v. RREF BB SBL Acquisitions, LLC*, 336 Ga. App. 411, 416 (2016) ("Banking records, at least for purposes of Fourth Amendment jurisprudence, are considered to be property of the bank in which one has no reasonable expectation of privacy." (citations omitted)).

Because the banking subpoena did not implicate the Fourth Amendment, Plaintiff cannot establish a violation of his Fourth Amendment rights with respect to OIG's subpoena of same.

Plaintiff relies heavily upon O.C.G.A. § 7-1-360, a section of Georgia's banking code. The banking code is, obviously, not coextensive with the Fourth Amendment and has no bearing on his constitutional claim. Out of an abundance of caution, however, we address whether there is any private right of action here, or any basis for Plaintiff to shoehorn the banking statute into a Fourth Amendment violation.

The section provides: "No financial institution shall be . . . required to disclose or produce to third parties, or permit third parties to examine any records pertaining to a deposit account, loan account, or other banking relationship" with four enumerated exceptions. O.C.G.A. § 7-1-360(a). One is "[w]here the records of accounts or other customer records are requested through subpoena or other administrative process issued by a state, federal, or local administrative agency." *Id.* at (a)(2). The other is "[w]here the records of accounts or other customer records are requested in conjunction with an ongoing

criminal or tax investigation of the depositor or other customer by a state or federal grand jury, taxing authority, or law enforcement agency." *Id.* at (a)(3). In the former circumstance, "the agency or other party seeking the disclosure or production of the records shall provide notification to the depositor;" in the latter, the financial institution "shall not" notify the depositor "without the consent of the requesting authority." *Id.* at (b).

Plaintiff contends that OIG's subpoenas fall under the subsection (a)(2) exception (a request by an "administrative agency"), not the (a)(3) exception (a "criminal or tax" investigation by a "law enforcement agency.") *See, e.g.*, Doc. 1 at ¶ 47 ("The OIG and Inspector General did not comply with O.C.G.A. § 7-1-360(b) in issuing the subpoena . . . ."); *id.* at ¶ 138 ("Defendants were not conducting a 'criminal or tax investigation as defined by O.C.G.A. § 7-1-360(a)(3)."); *id.* at ¶ 139 ("Defendants were required to comply with O.C.G.A. § 7-1-360(2) [sic]."). Plaintiff alleges that the subpoena wrongfully instructed the bank not to notify Mr. Tokarz. Doc. 1 at ¶ 48. Plaintiff also relies heavily on the City Attorney's statement that OIG subpoenas "are in the nature of those issued pursuant to O.C.G.A. § 7-1-360(2) [sic]" and that "failure to provide notice to the depositor . . . is not legal." *Id.* at ¶¶ 118, 140.[6]

---

[6] To the extent Plaintiff is arguing that the City Attorneys' February 3, 2025, "cease and desist" constitutes notice that the subpoenas were unlawful, that cannot stand, as the notice was plainly sent long after the subpoenas were issued.

Contrary to the City Attorney's letter, Section 7-1-360 of the Georgia Code does not provide a right of action for an alleged failure of notice, and no court has construed § 7-1-360 as providing an implied right of action. Westlaw's database contains only eleven (11) decisions citing § 7-1-360 for any reason, none of which discusses individual liability.[7]

Even if there were a private right of action, no legal authority clearly establishes whether OIG's investigations in this instance would fall under O.C.G.A. § 7-1-360(a)(2) versus (a)(3). To the contrary, as set forth above, the City Charter defines the "duties" of the Inspector General to include "[r]eporting, as appropriate, suspected criminal violations of a law, rule, regulation, or internal policy related to a matter under the Compliance Division to the local, state or federal law enforcement agency with proper jurisdiction." Attachment 1 at § 8-106(b)(8). It further endows OIG with "jurisdiction to investigate and take appropriate action regarding: [. . .] Allegations of violations of Chapter 2, Article X; of Chapter 3; or Chapter 114 of the City Code of Ordinances." *Id.* at § 8-106(a)(4). Two of these three chapters in turn provide for criminal penalties and prosecution. *See* Attachment 3 at § 2-1488, Attachment 4 at § 3-2

---

[7] Ten of the eleven decisions concern discovery motions and admissibility of evidence obtained through § 7-1-360 at trial. The eleventh is an unpublished bankruptcy decision ruling that compliance with Bankruptcy Rule 2004 would satisfy the requirement of § 7-1-360 that discovery of records of a financial institution be compelled by a court of competent jurisdiction. *In re Bennett*, 2008 WL 7872889, at *1 (Bankr. N.D. Ga. Apr. 15, 2008).

Furthermore, the fact that the City of Atlanta has amended the Charter specifically to require prior notice of subpoenas, and specifically to classify OIG's investigations as "administrative," is powerful proof that neither item was clearly established in the prior version of the law. *See* Attachment 2 at page 5 (amended section 8-101(e)(5)); *id.* at page 3 (amended Section 8-101(b)).

OIG's issuance of the subpoena[8] therefore did not violate any right Plaintiff has under the Fourth Amendment—and certainly was not "clearly unlawful" as Plaintiff must prove to negate Ms. Manigault's qualified immunity. *Paez, supra.*

### 3. First Amendment claim

Count III of Plaintiff's Complaint alleges that Defendants "violat[ed] his rights under the First and Fourteenth Amendment" when OIG referred certain matters to the CFC. Doc. 1 at ¶¶ 152-54. Plaintiff alleges Ms. Manigault "would not have taken the same action absent" "the speech engaged in by Plaintiff on September 3, 2024 and thereafter." *Id.* at ¶¶ 147, 152. Plaintiff characterizes the CFC referral as "frivolous State Ethics Commission charges with illegally obtained financial documents." *Id.* at ¶ 152.

---

[8] It does not appear that Mr. Tokarz is claiming standing to sue over any of the other subpoenas described in the Complaint, all regarding parties other than himself. To the extent he is making such a claim, the same arguments set forth herein apply to the other subpoenas, with greater force, as he certainly possesses no Fourth Amendment privacy interest in another person's banking records.

The Complaint does not plausibly allege a violation of Mr. Tokarz's rights under the First Amendment—much less "clearly unlawful" conduct by Ms. Manigault.

"It is particularly difficult to overcome the qualified immunity defense in the First Amendment context." *Gaines*, 871 F.3d at 1210 (collecting cases). That general observation, made in consideration of decades of binding Eleventh Circuit precedent, is especially true here, where Ms. Manigault had an affirmative duty to take the one allegedly retaliatory action identified in the Complaint; namely, the referral of suspected violations of law to the appropriate authorities. *See* Attachment 1 at § 8-106(b)(8) (OIG's duties include "[r]eporting, as appropriate, suspected criminal violations of a law, rule, regulation, or internal policy . . . to the local, state or federal law enforcement agency with proper jurisdiction.").

Mr. Tokarz does not allege any penalty or injury to him as a result of the referral. In fact, he asserts that the "The State Ethics Commission summarily dismissed [the] frivolous complaint."[9] Doc. 1 at ¶ 124. The "adverse action" he

_____

[9] In truth, we strongly question this assertion. OIG was not notified of any "dismissal." Mr. Tokarz's counsel confirmed to the undersigned counsel that neither he nor Mr. Tokarz received any written notice of "dismissal." As the letter was merely a referral, we don't even know if a formal "matter" or "case" was ever opened to be "dismissed." Of course, if there remains an open matter, Mr. Tokarz cannot collaterally attack that case, which is under the jurisdiction of the state election authorities, in this court.

alleges is merely a referral to another agency to investigate. However, that claim fails because both the Supreme Court and the Eleventh Circuit have specifically declined to define "retaliatory investigation," as a constitutional tort. *Rehberg v. Paulk*, 611 F.3d 828, 851 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012), citing *Hartman v. Moore*, 547 U.S. 250, 262 (2006); *see also Thompson v. Hall,* 426 F. App'x 855, 858 (11th Cir. 2011) (alleged "retaliatory" criminal investigation of individuals who spoke out at town hall meeting does not state a First Amendment constitutional violation).

Furthermore, the existence of probable cause to make the referral defeats Mr. Tokarz's claim. By analogy: a plaintiff who claims he was criminally prosecuted in retaliation for exercising his First Amendment rights cannot prevail if there is probable cause for the prosecution.  *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) (in First Amendment "retaliatory arrest" claim, requiring Plaintiff to plead and prove a want of probable cause). For a plaintiff who claims civil claims were brought against him in retaliation for exercising First Amendment rights, the same is true. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1300–01 (11th Cir. 2019). In the civil context (which is most analogous here; there is no allegation of arrest and prosecution), "Probable cause [. . .] requires no more than a 'reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication.'" *Id.* And for qualified immunity purposes, a public official is immune from suit unless it can be proved that there was not even *arguable*

probable cause, meaning that a reasonable officer "<u>could</u> have believed that probable cause existed." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (emphasis in original).

While this is not an "arrest" case, even if it was, Ms. Manigault would be entitled to qualified immunity. There is no allegation in the Complaint that there was a lack of probable cause, despite the use of the legally conclusory phrase "frivolous." A "frivolous" claim is one "without arguable merit either in law or fact." *Bilal v. Driver*, 251 F.3d 1346, 1349 (11th Cir. 2001). Where there is arguable probable cause, a claim therefore cannot be "frivolous." The October 2, 2024, letter, on its face, states a reasonable basis in law and fact for the referral; namely, the existence of transactions by a political campaign, and transactions made for the benefit of a political campaign, that were not reported as required by Georgia's campaign finance laws.

In sum, Mr. Tokarz's First Amendment claim cannot stand.

**C. Plaintiff does not state a viable state-law claim for "invasion of privacy."**

Count IV of the Complaint asserts a claim for "invasion of privacy," presumably in reference to the banking subpoenas.

1. <u>Ms. Manigault is entitled to state law "official immunity"</u>

Ms. Manigault is entitled to official immunity under state law. The Georgia Constitution provides that public officials are entitled to "official immunity"

when carrying out their official duties unless it can be established that they acted with "actual malice" or violated a "ministerial function." *Mommies Props., LLC v. Semanson*, 366 Ga. App. 153, 159 (2022). "Actual malice" in this context means a "deliberate intention to do wrong." *Id.* at 162. Poor judgment, or even ill will, if not enough to show "actual malice." *Id.* at 164. Similar to the "clearly established law" prong of federal qualified immunity, the violation of a "ministerial" duty to overcome official immunity requires a showing that the duty allegedly breached was "a specific, simple, absolute, and definite duty, task, or action in a specified situation without any exercise of discretion." *Barnett v. Caldwell*, 302 Ga. 845, 848 (2018).

The "underlying rationale for official immunity . . . is 'to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight.'" *Marshall v. Browning*, 310 Ga. App. 64, 70 (2011). The Georgia Court of Appeals has frequently held that an officer is entitled to official immunity from liability when carrying out an investigation. *See, e.g.*, *Wilson v. Cromer,* 356 Ga. App. 763, 767 (2020) (holding that, even if the arresting officers showed a "reckless disregard" for the plaintiff's rights, the officers were entitled to official immunity)*; Marshall*, 310 Ga. App. at 70 (holding that an officer was entitled to official  immunity when presented with "a difficult investigation," and where a "different investigator may have made choices more favorable to [the plaintiff]").

Based on the facts alleged, and the indisputably authentic records of which this Court may take notice, Ms. Manigault was plainly acting within the authority afforded her under the City's Charter in pursuing OIG's investigations and issuing subpoenas therewith. The August 14, 2024, report is supported by substantial evidence, and it cannot be said that it was "frivolous" or "malicious" in spite of the labels that Plaintiff places upon it. As set forth above, the law and the facts support Ms. Manigault's conclusion that the subpoenas could be issued without prior notice to account-holders, and any directive to the contrary is not a "simple, absolute, and definite duty, task, or action in a specified situation" such that it would be considered a "ministerial" duty. *Barnett*, 302 Ga. at 848.

2. <u>Even without an immunity, there is no cognizable claim for invasion of privacy here</u>

As set forth in detail *supra*, Mr. Tokarz does not have a right to privacy in the banking records, and there is no private right of action under the banking statute he relies upon.

Under Georgia law,

there are four disparate torts under the common name of invasion of privacy. These four torts may be described briefly as: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

*Dep't of Lab. v. McConnell*, 305 Ga. 812, 818 (2019) (quoting *Bullard v. MRA*

*Holding, LLC*, 292 Ga. 748, 751 (2013)).

Based on paragraph 159 of the Complaint ("constituted an affront to

Plaintiff [sic] personal dignity and an intrusion of solitude and private affairs"),

Plaintiff appears to be asserting only the first of these torts.

"[T]he Supreme Court [of Georgia] has held that the 'unreasonable

intrusion' [tort] involves a prying or intrusion, which would be offensive or

objectionable to a reasonable person, into a person's private concerns." *Anderson*

*v. Mergenhagen*, 283 Ga. App. 546, 549 (2007) (quoting *Johns v. Ridley*, 245 Ga.

App. 710, 712 (2000)). The Georgia Court of Appeals has also "held in several

cases that, to state a claim under the 'unreasonable intrusion' tort, the plaintiff

must allege a physical intrusion which is analogous to a trespass." *Id.* at 550

(citations omitted). In certain circumstances, "surveillance" can be sufficiently

"analogous to a trespass" to give rise to liability for unreasonable intrusion—

particularly when the surveillance is "repetitive" or "deliberately calculated to

frighten or torment," and *not* part of a legitimate private or public investigation.

*Id.* at 550-52 (collecting cases).

There are at least five distinct reasons Plaintiff's "invasion of privacy"

claim fails.

*First*, as discussed in detail above, the bank's records of Plaintiff's transactions are not Plaintiff's "private concerns." *Id.* at 549. A subpoena thereof does not state a claim for unreasonable intrusion under Georgia law.

*Second*, Ms. Manigault did not physically intrude upon Plaintiff in any way, and Plaintiff does not allege any facts from which the Court could assume she did.

*Third*, under Georgia privacy law, a third-party subpoena to a financial institution is not "surveillance," and Plaintiff will find no legal authority clearly establishing that it is.

*Fourth*, assuming *arguendo* a subpoena is "surveillance" for the purposes of an unreasonable-surveillance claim under Georgia law, Plaintiff alleges no "repetitive" conduct—Ms. Manigault subpoenaed the Bank's records only *one* time—nor that the Subpoena was "deliberately calculated to frighten or torment" him, as required to establish liability for unreasonable surveillance under Georgia law. *Id.* at 550-52.

*Fifth*, assuming *arguendo* a subpoena is "surveillance" for the purposes of an unreasonable-surveillance claim under Georgia law, the City Charter expressly empowered Ms. Manigault, when she was Inspector General, "in furtherance of an investigation," to "issue subpoenas to compel the production of documents and things" to "any person." Charter at § 8-101(e)(4). The Charter further did *not* (and still does not) require OIG to get a search warrant, court

order, or other such device before exercising its subpoena power; rather, OIG must seek a court "order as shall be proper for the production of any such documents" only *after* a "failure or refusal to produce the documents" in response to a subpoena. *Id*.

**IV.**    **Conclusion**

Ms. Manigault cannot be sued "in her official capacity as City of Atlanta Inspector General," and Plaintiff lacks standing to sue her for any kind of prospective relief in her individual capacity. Further, she is immune to all three of Plaintiff's claims for damages, because Plaintiff has no privacy interest in his bank's records and because Ms. Manigault did not violate any law—much less clearly established law—by issuing a subpoena to Plaintiff's bank, asking the bank not to notify Plaintiff of the subpoena, not notifying Plaintiff of the subpoena herself, or referring Plaintiff's investigation to a state agency.

For the foregoing reasons, the Court should dismiss Plaintiff's Complaint in its entirety as against Ms. Manigault in both her official and individual capacities.

Respectfully submitted this April 29, 2025.

/s/ James Radford
James Radford
Georgia Bar No. 108007
Jake Knanishu
Georgia Bar No. 597103
Radford Scott LLP
125 Clairemont Ave., Suite 380
Decatur, Georgia 30030
(404) 400-3600
jradford@radfordscott.com
jknanishu@radfordscott.com

*Counsel for Plaintiff*

<u>CERTIFICATE OF FONT AND SERVICE</u>

This is to certify that on April 29, 2025, I prepared the foregoing in Book Antigua, 13-point type in accordance with L.R. 5.1(C) and that I electronically filed the document with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

*/s/ James Radford*
James Radford
Georgia Bar No. 108007